MARSHALL B. ROULETTE, Petitioner-Appellant, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents-Appellees.

First District (3rd Division)   No. 1—92—0448

Opinion filed December 29, 1993.

Law Offices of Chicago-Kent College of Law, Illinois Institute of Technology, of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, of counsel), for respondent.

JUSTICE CERDA delivered the opinion of the court:

Petitioner, Marshall B. Roulette, appeals from an order of re-

spondent Illinois Human Rights Commission (Commission) finding that petitioner failed to establish a *prima facie* case of discrimination based on a perceived mental handicap when he was not hired as a police officer. Petitioner argues that: (1) the Commission relied on interpretive rules that directly conflicted with the Illinois Human Rights Act (the Act) (Ill. Rev. Stat. 1991, ch. 68, par. 1—101 *et seq.*); (2) the finding that petitioner was not perceived as mentally handicapped was against the manifest weight of the evidence; and (3) petitioner was not in fact mentally handicapped. We affirm.

Petitioner filed a complaint on September 12, 1984, with the Commission alleging a violation of the Act based on the failure of respondent State of Illinois Central Management Services (CMS) to hire him for a police officer position. After a hearing before an administrative law judge, the Commission dismissed the case based on the administrative law judge's recommendation. Petitioner's request for a rehearing was denied, and he appealed.

Dr. James Chandler testified to the following at the June 6, 1989, hearing. He had a bachelor's degree in psychology, a master's degree in clinical psychology, and a doctorate in community mental health. Formerly, he was chief psychologist for the Illinois State Police. He screened candidates, including petitioner, for suitability for working as a CMS police officer. The screening consisted of an MMPI psychological test and a structured interview. Candidates for positions with CMS police were categorized, after evaluation, in one of three categories: psychologically acceptable, marginal, or unacceptable. Unacceptable candidates were persons who did not "take the process honestly" or were "outside the limits" of the general population based on either the MMPI or the interview. Petitioner was categorized as unacceptable by psychological standards.

In the interview with petitioner, Chandler asked petitioner what he felt sorry about in his life. Petitioner responded that he had nothing to be sorry about. He also asked petitioner if he was undergoing particular stress in his job, and petitioner's answer was that he did not think Chandler would know it because he could hide it from Chandler. Petitioner listed his strengths but no weaknesses in response to Chandler's question. He asked petitioner about the death of his wife, and he responded that it was none of Chandler's business. Chandler got the impression that petitioner felt he should not have to go through the process and that he was above it. Petitioner was not very open. Chandler rated him poorly based on the interview, but he waited for the MMPI results before reaching a final opinion.

Halfway through the interview, Chandler wrote a question to

himself concerning narcissistic character disorder. A person with this disorder was egotistical, felt superior to others, had little empathy for others, did not take supervision well, and did not blend in well with others. Chandler would write notes so that when the MMPI results came in, he could check to see if they were in agreement with his feelings from the interview. Petitioner's MMPI results came back marked "evasive." The test was not taken honestly. Therefore, Chandler could not confirm his impression of narcissistic character disorder, and he dropped the issue.

Petitioner did not suffer from a mental illness. But Chandler did not make a determination as to any particular diagnostic classification for petitioner. He perceived character traits that would cause petitioner to be egotistical, superior acting, and unable to see fault in himself, that would cause a great deal of difficulty fitting in with the other people going through the police training, and that would make it difficult to be supervised. Chandler had to probe more than he did with the other candidates to get information. He had a feeling that petitioner, especially in regard to his job credentials, was hiding something. Chandler believed that petitioner was psychologically unsuited for the position. Petitioner would not get along with other police officers. Petitioner made statements, in connection with his wife's suicide, like "that was her problem." CMS police come in contact with many people, and a CMS police officer should have empathy and some feeling for others especially because of the work "with mental health."

The psychological evaluation was just one part of an elaborate selection process including background investigations, physical evaluation, physical fitness testing, and an intelligence test. The correlation between a person who tested unacceptable and a bad background investigation was very high.

Petitioner testified to the following at the June 7, 1989, hearing. He was a Chicago police officer. He worked as a police officer specialist from December 1978 to April 1983. In that position, his responsibilities included the responsibility for the training and evaluation of new recruits to the police department. He would determine the fitness of these officers and would recommend whether they should continue as police officers or whether they should be terminated. He resigned from the department effective April 1983 because of a lack of career advancement opportunity and because he wanted to assist his wife in starting a business. He was employed previously as a corporate credit manager and a director of accounting for a sales and manufacturing company.

Petitioner graduated from high school. He attended college from

September 1976 to June 1977 for 11 semester hours. He also attended college for 11 quarter hours from September 1972 to May 1973. He attended Chicago Citywide College for 40 semester hours from December 1978 to September 1979 with a major in criminal justice and a major in public administration. He received a law enforcement certificate in December of 1979. He graduated at the top of his class at the Chicago Police Academy.

In 1984, petitioner applied for a position as a CMS police officer. As part of his application for the CMS position, he took an oral board examination and the MMPI, and he wrote a short biography. The oral board examination consisted of three interviews with three different persons. He received grades for those interviews of two A's and one A plus.

Petitioner further testified he also had a very brief psychological oral interview with Chandler that lasted 20 minutes at the most. Among the questions asked in the Chandler interview was what were his feelings about his wife's suicide. He responded that it was a traumatic experience. After Chandler pursued questions about how his wife had died, including how the wife had shot herself, he stated that he did not understand how this line of questioning related to his qualifications for the job.

Marvin J. Pitluk testified for petitioner to the following at the June 8, 1989, hearing. He was a psychologist who had experience in assisting in the hiring of employees. His conclusion from meeting with petitioner was that petitioner was extremely bright, was socially, emotionally and attitudinally competent, and had the ability to be a leader in dealing with police personnel. Petitioner was competent to do police work at a supervisory level. His opinion was that in 1984 petitioner was not suffering from narcissistic character disorder. Petitioner was eminently psychologically qualified today as he was in 1984 for police work, including at a supervisory level.

Louis Giordano testified to the following at the June 9, 1989, hearing. He previously was the Director of CMS. Information from the interviews of CMS police officer candidates was compiled on a single sheet of paper and given to him by his staff. He was the final decisionmaker for hiring the police officers. He reviewed the sheet with regard to whether plaintiff would be selected for the position. He made marginal notes on the sheet while talking on the telephone with Chandler after Chandler had performed the psychological reviews. Chandler would give him an indication of whether he felt that the candidate fit the psychological profile. Next to petitioner's name were written notations of "real problem, poor" and "out." These notes were written after speaking to Chandler. He may have

considered Chandler's recommendation when he entered the word "out" in connection with petitioner but he did not remember why he wrote it.

The Illinois Human Rights Act states that the public policy is as follows:

> "To secure for all individuals within Illinois the freedom from discrimination because of race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental handicap, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations." Ill. Rev. Stat. 1991, ch. 68, par. 1—102(A).

Handicap is defined in the Act as follows:

> "a determinable physical or mental characteristic of a person, including, but not limited to, a determinable physical characteristic which necessitates the person's use of a guide, hearing or support dog, the history of such characteristic, or the perception of such characteristic by the person complained against, which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic:
>
> (1) For the purposes of Article 2 is unrelated to the person's ability to perform the duties of a particular job or position ***." (Ill. Rev. Stat. 1991, ch. 68, par. 1—103(I)(1).)

According to the Commission's regulation:

> "The 'perception' of a handicapping condition may occur with regard to an individual who has been misdiagnosed, misclassified, or erroneously viewed as one who is or has been so afflicted; such an individual similarly is protected against discrimination based upon that erroneous perception." 56 Ill. Adm. Code § 2500.30(b) (1992).

Under the Act, it is a civil rights violation:

> "For any employer to refuse to hire *** or to act with respect to recruitment, hiring *** on the basis of unlawful discrimination." Ill. Rev. Stat. 1991, ch. 68, par. 2—102.

Petitioner first argues on appeal that the administrative law judge relied on the following interpretive rules in the Administrative Code that directly conflicted with the Act:

> "To be covered, a condition must be 'determinable' by recognized clinical or laboratory diagnostic techniques." (56 Ill. Adm. Code § 2500.20(b)(2) (1992).)
>
> "An employer *** may require all applicants who have been found otherwise qualified for selection to submit to pre-employment physical or psychological examinations, for the purpose of determining whether such applicants are capable of acceptably

performing the activities necessary to the job or training at issue." (56 Ill. Adm. Code § 2500.60(b) (1992).)

Petitioner argues that the Act does not require that the perceived condition must be determinable by recognized diagnostic techniques and that the Act only requires that the employer perceived a determinable mental or physical characteristic.

■ It is not necessary to reach the issue whether the rule stating that the condition must be determinable by recognized diagnostic techniques conflicts with the Act. Petitioner's appeal is from the Human Rights Commission's ruling that there was no violation of the Act when CMS failed to hire him as a police officer based on a perceived mental handicap. Petitioner attempted to prove that Dr. Chandler erroneously made a diagnosis that he suffered from a narcissistic character disorder. It is the ruling and not the reasoning of the Commission that is to be reviewed. (See *Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387, 457 N.E.2d 9.) As stated in *Material Service Corp.*:

> "It is the judgment and not what else may have been said by the lower court that is on appeal to a court of review. (*Rabus v. Calcari* (1959), 16 Ill. 2d 99; *Gould v. Gould* (1951), 408 Ill. 526.) The reviewing court is not bound to accept the reasons given by the trial court for its judgment (*Weber v. Woods* (1975), 31 Ill. App. 3d 122)." 98 Ill. 2d at 387.

Petitioner next argues that CMS discriminated against him on the basis that he was erroneously perceived as having a mental handicap. Petitioner relies on Dr. Chandler's determination that petitioner was psychologically unacceptable, Dr. Chandler's notation of the possibility of narcissistic character disorder, and the Director's rejection of petitioner after speaking to Dr. Chandler on the telephone.

■ We hold that the Commission correctly found that CMS did not perceive petitioner as having a mental handicap. Dr. Chandler was unable to confirm whether petitioner had the narcissistic character disorder and testified that petitioner did not suffer from a mental illness. Rather, Dr. Chandler believed that petitioner was psychologically unsuited for the position. He found egotistical character traits that would have made it difficult for petitioner to fit in with other trainees and to be supervised. Even if those character traits could be considered a determinable mental characteristic under the Act's definition of handicap, the characteristic would not meet the other part of the definition: unrelated to the person's ability to perform the duties of a particular position. Dr. Chandler believed that, if hired, petitioner would not get along with other police officers.

The decision of the Commission was not against the manifest weight of the evidence presented.
The judgment of the Commission is affirmed.

Affirmed.

RIZZI and GREIMAN JJ., concur.